**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Joseph BYERLEY, Defendant–Appellant.**

No. 91–3625.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 5, 1992.

Decided July 13, 1993.

Andrew B. Baker, Jr., Asst. U.S. Atty., Dyer, IN, Robert Gevers, Fort Wayne, IN (argued), for U.S.

Suzanne Philbrick, Chesterton, IN (argued), for Joseph Byerley.

Before RIPPLE, KANNE, Circuit Judges, and WILLIAMS, District Judge.*

ANN CLAIRE WILLIAMS, District Judge.

Joseph Byerley and Randy Taylor were charged in a one count indictment with conspiring to distribute cocaine "together and with others known and unknown to the Grand Jury" in violation of 21 U.S.C. § 846. The two defendants were tried together. At the close of the government's case, Taylor was acquitted. The jury found Byerley guilty and he was sentenced to 151 months in prison.

On appeal, Byerley challenges the sufficiency of the evidence as well as certain remarks made by the prosecutor during closing arguments. For the following reasons, we affirm Byerley's conviction.

## Background

This case arose out of an investigation of Bill Johnson by the Fort Wayne, Indiana Police Department and Allen County Drug Task Force. On December 12, 1989, Matt Diamond was arrested after buying 3 ounces of cocaine from Johnson. After his arrest, Diamond agreed to cooperate by assisting the officers in making a case against Johnson, his supplier.

On December 13, 1989, the police obtained and executed a search warrant on Johnson's residence. During this search, the police seized approximately $49,000.00 in cash, a loaded .45 caliber handgun, 7 boxes of 9 millimeter ammunition, several canisters with fake bombs used to store and conceal items, 2 explosive devices, a Port–O–Gram electronic scale, 2 ziploc baggies filled with a brownish substance, 2 empty plastic jars of inositol powder which is used to cut cocaine, a metal

---

* The Honorable Ann Claire Williams, District Judge of the United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation.

sifter, 2 pieces of glass with cocaine residue, a razor blade, and a small amount of cocaine from Johnson's home. After the execution of the search warrant, Johnson was interviewed and agreed to cooperate with the Allen County Drug Task Force by providing information regarding his cocaine distribution network.

On the evening of December 13, 1989, Johnson made a recorded phone call to Byerley, his supplier. Johnson began talking with Byerley about 3 "pizzas," which was the code the men had developed to mean kilograms of cocaine. After Byerley had Johnson call him back on a different telephone line, the two discussed the cost of buying 3 kilograms of cocaine. They also discussed how to move the cocaine from Florida, where Byerley lived, to Indiana, where Johnson resided. The conversation ended with Byerley's request that Johnson give him time to get some prices and then call him back.

On December 14, 1989, Johnson made another recorded phone call to Byerley, and Byerley told Johnson he was going to pass on the deal. Byerley also wanted to know if everything was alright in Fort Wayne because he had heard something strange about Diamond. Johnson assured Byerley that everything was fine.

Johnson told the agents and testified at trial that he began buying cocaine from Byerley in March 1987 and continued to buy and sell this cocaine through August 1989. Johnson purchased 7–8 kilograms of cocaine from Byerley during this time period, paying approximately $18,000.00 per kilogram. Johnson followed the same routine each time he purchased cocaine from Byerley. Johnson would bring his money to Florida, give it to Byerley, and, together, they would meet with Byerley's supplier, Mike Perez, to get the cocaine. On one occasion, they obtained the cocaine from another unknown individual because Perez could not be contacted.

Initially, Johnson brought the cocaine back to Fort Wayne for his own use. He packed the cocaine in coffee grounds as Byerley had showed him to avoid detection. However, as the amounts became larger and he became concerned about highway patrol profile checks, Johnson paid couriers to transport the cocaine by car or truck from Florida to Fort Wayne without telling the couriers what was in the packages. Johnson would then sell the cocaine by the ounce to individuals in the Fort Wayne area. Johnson's customers included Diamond, Jerry Moore, Kevin Hanefeld, and several others who would in turn sell the cocaine to others.

In July 1990, Johnson traveled to Florida with two Allen County Drug Task Force officers in an attempt to identify Byerley and Perez. Although Johnson identified the home of Byerley's neighbors, Robert and Iris Agras, as the house where he and Byerley once retrieved approximately $100,000.00 in spending money from a brief case in an hallway attic, they were not contacted by the police.

Tina Bennett, Byerley's ex-girlfriend and the mother of his child, testified at trial that from 1985–1988, before moving to Fort Wayne, she and Byerley lived in Florida, and they both knew Robert and Iris Agras, and Perez. She denied knowing anything about Byerley's involvement in cocaine trafficking. However, she admitted that Johnson visited Byerley in Florida during the spring of 1987 and she called Byerley in December 1989 to tell him about Diamond's arrest.

In his trial testimony, Byerley denied any involvement with Johnson, the Agrases, Perez, or anyone else involved in the distribution of cocaine, although he confirmed that Johnson visited Florida in March 1987. Byerley also admitted that he knew Johnson was talking about cocaine in their December 13 and 14, 1989 telephone conversations even though cocaine was not specifically mentioned.

### Discussion

Byerley contends that the government failed to present sufficient evidence to sustain his conviction for conspiracy to distribute cocaine. Specifically, Byerley asserts there was not sufficient evidence to establish the existence of a conspiracy between him and "others known and unknown to the grand jury," particularly in light of his codefendant's acquittal of the conspiracy charge.

Byerley bears a heavy burden to sustain this challenge. *United States v. Hernandez*, 948 F.2d 316, 321 (7th Cir.1991); *see United States v. Briscoe*, 896 F.2d 1476, 1504 (7th Cir.), *cert. denied sub nom., Usman v. United States*, 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). An appellate court must uphold a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). An appellate court must not weigh the evidence nor assess the credibility of the witnesses. *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986); *United States v. Wilson*, 715 F.2d 1164, 1173 (7th Cir.), *cert. denied sub nom., Williams v. United States*, 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983). "Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilty beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. Whaley*, 830 F.2d 1469, 1473 (7th Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988) (quoting *United States v. Moore*, 764 F.2d 476, 478 (7th Cir.1985)).

Having articulated the applicable standard, we turn to the law of conspiracy. A conspiracy consists of a combination or confederation of two or more individuals formed for the purpose of committing a criminal act. *United States v. Hedman*, 630 F.2d 1184, 1192 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). However, the parties involved in a conspiracy do not have to know the other conspirators or participate in every aspect of the conspiracy. *United States v. Davis*, 838 F.2d 909, 913 (7th Cir.1988); *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). As long as the conspiracy continues and its goal is to achieve a common objective, it is sufficient that a party have reason to know that others were involved in the conspiracy. *See Briscoe*, 896 F.2d at 1505; *Noble*, 754 F.2d at 1329.

Moreover, in establishing the existence of a conspiracy or an individual's participation therein, it is permissible for the jury to consider circumstantial evidence because, by its very nature, a conspiracy "is conceived and carried out clandestinely, and direct evidence of the crime is rarely available." *United States v. Mayo*, 721 F.2d 1084, 1088 (7th Cir.1983) (quoting *United States v. Washington*, 586 F.2d 1147, 1153 (7th Cir.1978)); *see also Briscoe*, 896 F.2d at 1505. Therefore, "not only is the use of circumstantial evidence permissible, but circumstantial evidence may be the *sole support* for a conviction." *United States v. Reed*, 875 F.2d 107, 111 (7th Cir.1989) (quoting *United States v. Vega*, 860 F.2d 779, 793–94 (7th Cir.1988)) (emphasis in original).

Contrary to Byerley's assertion, Taylor's acquittal does not mean that Byerley's conviction cannot stand. Byerley's conviction will stand as long as the evidence adequately supports a finding that Byerley conspired with "others known or unknown to the grand jury" as charged in the indictment. *See United States v. Mancari*, 875 F.2d 103, 105 (7th Cir.1989); *United States v. Onick*, 889 F.2d 1425, 1432 (5th Cir.1989).

We agree with the government that there are two sources of evidence which adequately support Byerley's conspiracy conviction: Johnson's testimony and the December 13 and 14, 1989 recorded telephone conversations between Johnson and Byerley.[1] Johnson testified at trial that Byerley was his cocaine source for approximately 2½ years, supplying him with 7–8 kilograms of cocaine during that time period. Johnson had the cocaine transported to Fort Wayne by various couriers where he then sold it to various customers. These customers then sold the cocaine to other individuals.

Johnson's testimony is corroborated by the December 13 and 14, 1989 recorded telephone calls Johnson made to Byerley. Byer-

---

1. Although the court has reviewed the transcripts of the recorded conversations, the parties did not submit the transcript of the trial as part of the record on appeal. Therefore, this court will rely on the facts summarized by the parties in their briefs.

ley immediately understood Johnson's reference to "3 pizzas" as meaning cocaine and willingly discussed the cost of such a purchase. Indeed, Byerley even admitted at trial that he knew Johnson was talking about cocaine in these phone calls. Johnson and Byerley also discussed how to transport the cocaine from Florida to Indiana. In addition, Byerley asked if anything had happened to Diamond, their customer who was arrested by the police after buying cocaine from Johnson.

Viewing the evidence in the light most favorable to the government as the law requires, we find that a rational trier of fact could have found beyond a reasonable doubt that Byerley was guilty of conspiring to distribute cocaine with "others known and unknown to the grand jury." Johnson's testimony and the taped telephone conversations adequately demonstrate that Johnson's couriers and customers were members of the charged conspiracy.

As Johnson testified, his couriers brought the cocaine he purchased from Byerley from Florida to Indiana, Johnson sold the cocaine to their Indiana customers, and their customers resold the cocaine to other individuals. In fact, in one recorded conversation with Johnson, Byerley specifically asked if anything had gone wrong with Diamond, one of their customers, after hearing that Diamond had been arrested. Johnson's testimony and the phone conversations also demonstrate that Byerley knew about the couriers' and customers' participation in the conspiracy. For example, in their taped conversation regarding transporting the cocaine, Byerley specifically referred to Johnson's couriers as the "boys who are so good at that." This statement adequately demonstrates that Byerley knew that couriers were used to transport the cocaine from Florida to Indiana.

It is well established that jurors may rely on the uncorroborated testimony of a co-conspirator. Furthermore, this court will not reassess a jury's credibility determination. As this court stated in *United States v. Trujillo*, 959 F.2d 1377 (7th Cir.), *cert.*

*denied,* —— U.S. ——, 113 S.Ct. 277, 121 L.Ed.2d 204 (1992): " . . . we will not substitute our own determination of the credibility of witnesses for the jury which had an opportunity to observe first hand the conflicting testimony and the demeanor of the witnesses in question." *Id.* at 1384 (quoting *United States v. Liefer,* 778 F.2d 1236 (7th Cir.1985); *see also United States v. Lendmann,* 757 F.2d 916, 919 (7th Cir.1985). Only if the testimony is "inherently unbelievable" will this court overturn a guilty verdict based on the testimony of a co-conspirator testifying pursuant to a plea agreement. *Id.* (citing *United States v. Jewel,* 947 F.2d 224, 232 (7th Cir.1991).

We are not persuaded that Johnson's testimony is inherently unbelievable. His testimony regarding the pertinent cocaine distribution network comports with his tape recorded telephone conversations with Byerley.

Byerley argues that Johnson's testimony is not credible because the police found nothing during their 1991 trip to Florida which corroborated Johnson's story. According to Byerley, the incredibility of Johnson's story is underscored by a comparison of his and Johnson's life styles. While Byerley's life style was modest, Johnson owned a brand new Corvette and lived in a custom-made home. Moreover, Byerley contends that while Johnson was found to be in possession of cocaine, a large sum of money, drug paraphernalia, and loaded weapons, no incriminating evidence was found on Byerley or any place connected with him. Particularly in comparison to Johnson, Byerley claims that he was "whistle clean."[2]

Contrary to Byerley's contention, these factors do not necessarily indicate that Johnson's testimony is inherently incredible. The jury was made aware of Johnson's role in the cocaine distribution network at issue and Johnson's personal interest in testifying against Byerley. Moreover, the jury was adequately instructed by the trial court on credibility of the witnesses. Specifically, the jury was instructed that it must determine whether Johnson's testimony had been affected by his personal interest in receiving a lighter sentence or if there were additional

---

**2.** Brief and Appendix of Defendant–Appellant    at 13.

reasons why his testimony should be considered with great care because Johnson was a drug addict. After being instructed regarding the credibility of witnesses and the weight to be given to their testimony, the jury chose to rely on Johnson's testimony. This determination is well within the province of the jury. We cannot substitute our assessment of Johnson's credibility for that of the jury. *Trujillo*, 959 F.2d at 1384. Therefore, Byerley's conviction cannot be overturned on this basis.

Byerley also argues that his conviction should be overturned because one of the prosecutor's remarks during closing arguments denied him a fair trial. During closing arguments, the prosecutor described the cocaine business as:

> a business that is run totally by greed and it is a business whose product is one of the most dangerous items in any marketplace anywhere on this planet.

(Tr. 3/434). Byerley's attorney objected to this remark on the grounds that it was highly prejudicial and inflammatory, and the trial court instructed the jury as follows:

> Ladies and Gentlemen, you should disregard the comment about the dangerous character of the product involved in this case. This case will be decided on the basis of the evidence presented. You may proceed.

(Tr. 3/435). Byerley argues that this instruction was not sufficient. He asserts that the prosecutor's comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process."[3]

In evaluating the effect of an allegedly improper prosecutorial remark during closing arguments, this court has observed that:

> Defendants are entitled to a new trial only if the government's comments were improper ones that prejudiced the defendants' rights to a fair trial.... In determining whether comments prejudiced the defendants' right to a fair trial, however, the comments must be viewed in the context of the entire trial.

*United States v. Ferguson*, 935 F.2d 1518, 1530 (7th Cir.1991) (quoting *United States v.*

*Stillwell*, 900 F.2d 1104, 1112 (7th Cir.), *cert. denied*, 498 U.S. 838, 111 S.Ct. 111, 112 L.Ed.2d 81 (1990)).

Review of this claim then requires a bifurcated analysis. We must first examine the challenged remark in isolation to determine whether it was improper. If the remark was improper, the remark should then be evaluated in light of the entire record to determine whether it deprived the defendant of a fair trial. *United States v. Spivey*, 859 F.2d 461, 465 (7th Cir.1988).

Having examined the prosecutor's remark in isolation, we are not persuaded that it was improper. The prosecutor in this case merely emphasized the threat of drugs to our society as a whole. While reference to particular families or friends during closing arguments have been found to be inappropriate, stressing the seriousness of drug charges and the gravity of this country's drug problem has not been deemed improper. *See United States v. Dominguez*, 835 F.2d 694 (7th Cir.1987); *United States v. Zanin*, 831 F.2d 740 (7th Cir.1987). For example, in *Ferguson*, the government made the following remarks in closing argument:

> [N]obody has to tell you about the scourge of drugs in our society today and the effect it is having on the social fabric today. I am not going to try to lecture you about that, although right now I feel a sudden flush of energy to do so.
>
> You may hear that people, individual people, don't have a chance to make a difference in the fight against drugs. Ladies and gentlemen, that is just wrong. The evidence in this case is overwhelming.... Here is your chance to do something.

935 F.2d at 1530. This court found that those references to society's drug problems and the defendant's role in exacerbating this problem were proper and did not deprive the defendant of a fair trial. *Id.* at 1531. The prosecutor's statement in the instant case was much less inflammatory and less extensive than the *Ferguson* prosecutor's permissible statements. The prosecutor merely emphasized the negative impact of drug traf-

3. Brief and Appendix of Defendant–Appellant at 21.

ficking on our society. Under the law of *Ferguson, Zanin,* and *Dominguez,* this statement is not improper. Therefore, the prosecutor's statement could not have deprived Byerley of a fair trial.

Having determined that the record was sufficient to support the jury's guilty verdict and the trial court did not commit reversible error, we affirm Byerley's conviction.

AFFIRMED.